No. 2--08--0245    Filed: 12-10-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 07--CF--1452 |
| BRANDON J. CASH, | ) ) ) | Honorable Ronald J. White, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Brandon J. Cash, was charged with possession with the intent to deliver between 30 and 500 grams of cannabis while within 1,000 feet of a school (720 ILCS 550/5.2(b) (West 2006)). Defendant moved to quash his arrest and suppress the evidence. The circuit court of Winnebago County heard and granted defendant's motion, finding that the brief activation of a police car's emergency lights and siren constituted a seizure of defendant without reasonable suspicion. The State appeals, contending that the trial court did not properly consider the totality of the evidence and that no evidence was adduced indicating that defendant submitted to the officers' show of authority. We affirm.

The following facts are taken from the record and the testimony of Special Agent Greg Brotan of the Drug Enforcement Agency (DEA) at the hearing on defendant's motion to quash and suppress. Brotan testified that, on April 17, 2007, he and other agents were in Rockford, keeping

a house belonging to Nicholas Castronovo under surveillance. Brotan testified that the surveillance was pursuant to a warrant to search the Castronovo house. The warrant had not been executed yet because Brotan had received information that Castronovo possessed an AK-47 assault rifle and other firearms in the house. In consideration of the firearm information, the agents did not want to chance a forced entry into the house; instead, they decided to wait until Castronovo left the house, at which time he could be more safely approached. Brotan explained that this was why they were keeping the house under surveillance.

At some point that day, Castronovo left the house, alone, apparently unarmed, and drove a maroon Lincoln Town Car. Brotan and two other officers followed Castronovo's car. Brotan testified that he did not have either a search warrant for Castronovo's car or an arrest warrant for Castronovo or defendant. Brotan testified that, as he followed Castronovo's car, he did not see Castronovo commit any traffic violations. Castronovo stopped and parked his car in the 2200 block of Edgebrook Drive.

Brotan testified that there were other cars parked along Edgebrook Drive. Castronovo parked his car behind another Lincoln Town Car. Brotan did not clearly recall the color of the second Lincoln, but believed it may have been silver. Brotan testified that both cars were legally parked. Brotan testified that he was in an unmarked vehicle, as was each of the other two officers, Special Agent Hilgers of the DEA and Officer Mott.

Brotan testified that, shortly after Castronovo had parked, Hilgers and Mott pulled in behind the Castronovo vehicle. By that time, defendant had joined Castronovo in the car.

Brotan was initially unable to recall whether Hilgers used his lights and siren. After referring to his report, Brotan testified that Hilgers "hit the lights and siren real quick." Brotan explained that Hilgers activated the lights and siren to let Castronovo know that he was behind his car.

Brotan testified that, by the time he had arrived and parked his car behind the other two police cars, Hilgers and Mott were already out of their cars and on either side of Castronovo's car. Both defendant and Castronovo were already out of the car. Brotan testified that he did not hear Hilgers or Mott say anything to Castronovo or defendant, but he also testified that the officers had asked Castronovo and defendant to get out of the car. Brotan testified that it was reported to him that, when Castronovo and defendant opened the doors to the car, Hilgers saw a plastic bag on the seat, and both Hilgers and Mott smelled a strong odor of marijuana as soon as the car doors were opened.

Brotan testified that, as he approached Castronovo's car, he also noticed a strong odor of marijuana. Brotan explained that, based on the pungency of the odor, he believed that the marijuana had been grown hydroponically, as that tends to concentrate the THC content and leads to a more pungent smell than observed in marijuana that is not grown hydroponically. Brotan testified that the bag inside Castronovo's car contained a number of clear plastic bags, all of which contained marijuana. The total weight of the marijuana recovered totaled 87.5 grams. Brotan testified that $9,680 in cash was also recovered. According to Brotan, defendant eventually admitted that he was using the money to purchase marijuana from Castronovo.

Following Brotan's testimony and argument by the parties, the trial court gave the following ruling from the bench:

"We all know the fourth amendment says in essence that all searches must be premised by a search warrant based upon probable cause unless there's some exception.

I understand by the testimony that on April 17th of '07 the officers had with them a search warrant for the address of 4010 Highcrest Road.

The Court understands the reason why officers didn't go in, because they had information that there may be weapons involved and they're concerned about their safety. Rather than entering the residence pursuant to that lawfully issued search warrant, they backed off and observed Mr. Castronovo leaving the scene in a Lincoln Town Car, they followed, and the Town Car pulled into another location.

There were other officers involved besides Officer Brotan, *** and it's quite clear by the testimony that the vehicle that Mr. Castronovo had been driving was stopped.

One of the exceptions of the warrant requirement of the fourth amendment is search incident to the automobile search, which means, in essence, if the officers have probable cause to believe that evidence is located in a vehicle and that vehicle is moving or about to be moved, they have the authority to stop and search.

The question I have is was there any information in the officers' minds when Castronovo left the home whether or not he had any evidence of crimes or contraband in the vehicle. The officers testified they had no information that there were any weapons present on Mr. Castronovo, nor did they have any other information that any other contraband or illegal substance may be located in that car.

The car was stopped, and the issue now is, one, did the officers have 'the right to seize the occupants in the vehicle.'

There's been testimony that there were no traffic violations, no parking violations, and the officers pulled up, two other officers in different squads in addition to officer or Agent Brotan. The question is did the other officers have the opportunity to seize. The issue is seizure.

I think it's quite clear, and the Court is familiar with the cases, once the officer turns on lights, whether the vehicle is stopped by the officer or vehicle stopped, there must be some reason to seize that vehicle. And that's the question before the Court. We know that two other agents approached the vehicle where Mr. Castronovo was the driver, and passenger now would be this [d]efendant. Was the initial seizure, the turning on the lights and tapping the siren, was that justified?

Based on case law submitted to the Court, the Court finds there was a seizure and that the officers--did the officers have any reasonable articulable suspicion at that time that criminal activity was afoot that would even justify a Terry stop? I find that's not present in this case. There's been no testimony regarding the justification regarding the seizure of the vehicle. If the officers had pulled behind and walked up, would be a different story but, as the case law appropriately points out, case of [People v. Laake, 348 Ill. App. 3d 346 (2004)], just to read a portion, 'Driver of vehicle that was stopped on shoulder of road was detained for purpose of fourth amendment when officer pulled behind the vehicle and activated emergency overhead lights.'

So at the time the officers activated emergency lights there was seizure. And was that seizure justified? And I find there is no evidence presented that the seizure was lawful.

I'm going to grant the Defendant's Motion to Suppress the Evidence."

About three weeks later, the State filed a motion to reconsider. Nearly three months after the motion was filed, the court heard arguments and made the following ruling:

"We have a unique set of facts in this case, and I point out that the cases that [the State] has cited are distinguishable regarding the facts of this case. And this is why I'm going to go over my notes again.

And my recollection of the facts[,] and the transcript bears [this out,] that on April 17 of '07, the officer was involved with another officer in a search warrant for the address of 4010 High Crest Road. They were conducting surveillance, and there was no testimony presented that while the surveillance was going on, while the car left, that other officers arrived, and the search warrant was executed. I don't know when the search warrant was executed if it was, if [sic] fact, executed.

And they indicated the address belonged to a Nick Castronovo. The car that left was a maroon Lincoln Town Car. They had no arrest warrant for Mr. Castronovo or the defendant, in this case Brandon Cash.

They followed the vehicle, and the officer testified there were no violations of traffic violations, no other violations, and he gave the address of the 2200 block of Edgebrook.

Then there was a silver Lincoln Town Car parked, and then the car they were following pulled behind the other one, and they were both parked legally.

And then the officer says Castronovo was the second person.

MR. VELLA [defense counsel]: Second car behind.

THE COURT: The second car behind the first car. They were in an unmarked squad car. He was with another agent.

There's another agent who pulled behind his squad, meaning Agent Brotan, B-R-O-T-A-N. There were a total of three agents' cars there. And then one of the agents activated the lights and the siren was also put on. At that time the court determined that there was a stop based on the case law I cited.

Now, the court is aware of Terry v. Ohio, [392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968),] which states, basically, we know that if there is articulable suspicion that criminal activity is afoot, an officer may stop a person walking near the location or in a vehicle, but I find as the officer testified the search warrant had not been executed. I heard no facts involved in that, and the officer, once they activated the lights, that was the point in time when there was quote a detention. If they hadn't executed--strike--if they hadn't activated lights and put siren on, a different story, but they did. I can't change the facts in this case.

There was a detention. Based on the illegal detention, they walked up to the car and saw what they saw. The exceeded the stop for which they--they hadn't stopped the vehicle. There was no stop here, but when the lights were activated, that's when the stop occurs.

And I see no reason under [Terry] or the cases cited by the [S]tate that the court should change its decision, and again, under this unique set of facts involved, there is a detention and it's unwarranted. Motion to reconsider is heard and denied."

Within 30 days of the denial of the motion to reconsider, the State filed its notice of appeal. Thereafter, the State filed a motion to file a late notice of appeal and we granted that motion.

As an initial matter, defendant argues that, under People v. Marker, 382 Ill. App. 3d 464 (2008), the State's original notice of appeal was untimely, depriving us of jurisdiction. However, our

supreme court reversed that decision in People v. Marker, 233 Ill. 2d 158 (2009), holding that the State may first file a timely motion to reconsider, and then file a notice of appeal within 30 days of the resolution of the motion to reconsider. Thus, we have jurisdiction over this appeal. Further, we withdraw our grant of the State's motion to file a late notice of appeal as unnecessary, because the State's original notice of appeal was valid and vested us with jurisdiction over the appeal.

On appeal, the State argues that, under the totality of the circumstances, the trial court erred in granting defendant's motion to suppress evidence. The State contends that a police officer's activation of lights and siren does not automatically result in a seizure as of the moment of activation. Turning to defendant's arguments, the State contends that the trial court mechanically applied Laake's result (activating lights or siren behind a parked car results in a seizure at the moment the lights or siren are activated) without adequately considering Laake's admonition to fully consider the totality of the circumstances (Laake, 348 Ill. App. 3d at 349). The State then advances the argument that there was no evidence to demonstrate that either defendant or Castronovo demonstrated that they were submitting to the authority of the police. Without such a submission, the State argues that there was no seizure of defendant or Castronovo before the officers were able to smell the scent of marijuana as defendant and Castronovo exited Castronovo's vehicle. The State concludes that, upon smelling the odor, the police had probable cause to believe that a crime was being committed and only after that point did a seizure of defendant and Castronovo occur. The State then argues that the trial court followed outdated and repudiated case law in determining that, upon the brief activation of lights and siren, defendant and Castronovo did not feel free to leave the encounter with the DEA agents. Using the proper analytical framework set forth in People v. Luedemann, 222 Ill. 2d 530 (2006), according to the State, results in the conclusion that no seizure

took place until after defendant and Castronovo had exited Castronovo's vehicle. Last, the State argues that the search warrant gave them an adequate basis to approach Castronovo's vehicle. We address each contention in turn.

In reviewing a circuit court's ruling on a motion to suppress, we are usually faced with questions of law and fact. People v. Gherna, 203 Ill. 2d 165, 175 (2003); People v. Rubio, 392 Ill. App. 3d 914, 930 n.2 (2009) (noting that appellate review of a trial court's ruling on a motion to suppress often presents separate questions of law and fact). The factual issues are reviewed under the deferential manifest-weight-of-the-evidence standard because the trial court is in a better position to determine the weight and credibility of the witnesses, observe their demeanor, and resolve conflicts in the witnesses' testimony. Gherna, 203 Ill. 2d at 175. If we accept the trial court's factual determinations, then we review de novo whether suppression of the evidence is warranted under those facts. Gherna, 203 Ill. 2d at 175. We remain free to engage in our own plenary review, assessing the facts in relation to the issues presented and drawing our own conclusions when deciding what relief is warranted. Gherna, 203 Ill. 2d at 176. With these principles in mind, we turn to the State's contentions.

The State first contends that the trial court erred by mechanically applying the result in Laake. The State argues that, instead, the trial court should have looked to the totality of the circumstances, which would have led to the conclusion that no seizure occurred until after the agents had smelled the odor of marijuana in Castronovo's vehicle, conferring upon them probable cause to seize defendant and Castronovo. We disagree.

To understand the errors in the State's argument, we first look at Laake. In that case, the police received a tip at about 3 a.m. concerning a possible intoxicated driver. The officer sent to

investigate did not see any vehicles or the reported intoxicated driver in the vicinity. The officer widened his search somewhat and discovered the defendant's car stopped on the shoulder of the road, pointing in the direction the tip gave for the intoxicated driver's heading, and with its brake lights on. Laake, 348 Ill. App. 3d at 347-48. The officer pulled behind the car and turned on his overhead emergency lights, explaining that the driver of the stopped car would have been able to see the flashing lights and that he turned on the flashing lights to alert other motorists, as the location was isolated and not well lighted. Laake, 348 Ill. App. 3d at 348. The officer approached the defendant's stopped car, detected a strong odor of alcohol from inside the car, and noticed that the defendant had glassy, bloodshot eyes and was slurring his speech. The defendant's car had a flat front passenger-side tire. The defendant also admitted to the officer that he had recently been driving in the location of the tip about a possible intoxicated driver. Eventually the defendant was arrested for driving under the influence of alcohol. Laake, 348 Ill. App. 3d at 348.

The court noted that the issue in the case was whether the officer approached the defendant under the community caretaking function or whether, upon activating his overhead lights, the officer had commanded the defendant to remain stopped. Laake, 348 Ill. App. 3d at 349. The court stated that the standard for determining whether a detention occurred during a police-citizen encounter was whether a reasonable, innocent person in the circumstances would believe that he or she was free to leave. Laake, 348 Ill. App. 3d at 349.[1] The court further noted that it was required to evaluate all

---

[1]Presiding Justice Lytton, in People v. Roa, 377 Ill. App. 3d 190, 203-04 (2007) (Lytton, P.J., specially concurring), vacated, 229 Ill. 2d 687 (2009), recognized that our supreme court, in Luedemann, 222 Ill. 2d at 550, held the "free-to-leave test" to be an erroneous standard in cases involving an independent restraint of the defendant by a vehicle. Instead, Luedemann held that the

of the circumstances surrounding the incident when determining whether a detention occurred. Laake, 348 Ill. App. 3d at 349. The court held that it was well settled "that a police officer's use of overhead emergency lights, when directed at a particular person, would be interpreted by that person as a command to stay put." Laake, 348 Ill. App. 3d at 350. The court held that the defendant, at whom the emergency lights were directed, "would have felt compelled to stay put for [the officer's] inquiries." Laake, 348 Ill. App. 3d at 350.

This did not, however, end the court's inquiry. The court further noted that, although the defendant was technically detained as a result of the activation of the officer's emergency lights, the detention would not violate the fourth amendment (U.S. Const., amend. IV) unless it was unreasonable. Laake, 348 Ill. App. 3d at 350. The court held that the officer's stated purpose in stopping, namely, to check on the driver, was a proper purpose, opining that police officers routinely provide roadside assistance in addition to performing criminal investigations. Laake, 348 Ill. App. 3d at 350. The court also held that, because such assistance was designed to ensure public safety, any "concomitant technical detention" was not unreasonable. Laake, 348 Ill. App. 3d at 350. Because the officer's purpose was a factual issue and the trial court's determination was not against the manifest weight of the evidence, the court rejected the defendant's argument that the officer's real purpose was to conduct an investigation and that his invocation of community caretaking as his reason for stopping was a pretext or subterfuge. Laake, 348 Ill. App. 3d at 350.

Our review of the evidence adduced at the hearing on the motion to suppress and the trial court's rulings convinces us that the trial court, contrary to the State's contention, did not

---

appropriate inquiry was whether a reasonable, innocent person would feel free to decline the officer's requests or otherwise terminate the encounter. Luedemann, 222 Ill. 2d at 550.

mechanically apply <u>Laake</u> but, instead, considered the totality of the circumstances. The evidence demonstrated that Brotan and the others were keeping Castronovo's house under surveillance prior to executing a search warrant for the house. The agents did not have a search warrant for Castronovo's car, and they did not have an arrest warrant for either Castronovo or defendant. Because the agents had learned that Castronovo might have a significantly dangerous arsenal stored in the house, they did not want to enter the house while Castronovo was present. Instead, they wanted Castronovo to leave the house, at which time they would approach him.

Castronovo did leave his house and proceeded to drive away in his maroon Lincoln Town Car. The agents followed. Brotan testified that they did not observe Castronovo commit any traffic violations as Castronovo drove to his rendezvous with defendant. Brotan testified that, when Castronovo arrived, he parked on the street behind defendant's car. Again, Castronovo did not commit any violations parking behind defendant's car. Likewise, the testimony revealed that defendant's car was also legally parked. Brotan further testified that neither defendant nor Castronovo appeared to be in distress at any time before they exited Castronovo's vehicle.

Hilgers and Mott parked their vehicles behind Castronovo's and defendant's. As Hilgers was pulling in behind Castronovo, he activated his overhead emergency lights and siren. Hilgers and Mott then approached Castronovo's car and asked Castronovo and defendant to get out of the car. As Castronovo and defendant complied, Hilgers observed a plastic bag on the seat and both agents smelled the odor of marijuana coming from the inside of the vehicle. These facts are undisputed.

Under <u>Laake</u>, the activation of a police car's lights and siren directed at an individual is equivalent to a command to stop or to stay put. <u>Laake</u>, 348 Ill. App. 3d at 350. While the <u>Laake</u> court was able to find that the seizure engendered by the officer's activation of lights was reasonable

because it served a community caretaking purpose (because the car there had pulled onto the shoulder of the road, the hour was late, and the officer testified that he intended to render assistance to the driver), such evidence is lacking in this case. In the first place, the testimony revealed that it was daytime in an urban, not isolated, environment, with other cars parked on the street. The agents had seen nothing that would suggest that either Castronovo or defendant was in any sort of distress or needed any assistance.[2] The trial court carefully noted these circumstances in making its ruling. Laake did not stop its analysis at determining that a seizure had occurred. Instead, it properly went on to consider if the police-citizen encounter was reasonable. Laake, 348 Ill. App. 3d at 350. Because there was no evidence that Castronovo or defendant committed any traffic, parking, or other

_____

[2]We note that the Laake court also relied on the officer's subjective intent of rendering assistance to the driver. Our supreme court has recently reiterated that the police officer's subjective intent is irrelevant, because the reasonableness of the seizure is considered only objectively. People v. Wear, 229 Ill. 2d 545, 566 (2008). We, therefore, do not consider Brotan's testimony about his (subjective) purpose in stopping behind Castronovo's car. To the extent that it based its determination on the officer's subjective intent, Laake erred and we do not follow it.

Likewise, in both People v. Luedemann, 357 Ill. App. 3d 411, 419-20 (2005), rev'd on other grounds, 222 Ill. 2d 530, and People v. Mitchell, 355 Ill. App. 3d 1030, 1033-34 (2005), this court noted that, with respect to the community caretaking doctrine, courts have been willing to inquire into the police officer's subjective mental state for initiating an encounter with a citizen in determining whether a seizure could be justified. In light of our supreme court's holding in Wear, that the officer's subjective intent is irrelevant, we do not believe that these statements in our Luedemann opinion and in Mitchell remain viable, and we can no longer follow them.

violations, we agree with the trial court's determination that the seizure of defendant and Castronovo, effected when Hilgers activated his lights and siren and directed them at Castronovo's parked car, was unreasonable under the fourth amendment. Accordingly, we reject the State's argument that the trial court applied Laake mechanically and failed to consider the totality of the circumstances.

Next, the State contends that there was no evidence advanced during the hearing on the motion to suppress that demonstrated that defendant and Castronovo had submitted to the agents' show of authority when Hilgers activated his lights and siren. Additionally, the State contends that the trial court based its analysis on the wrong legal standard. We disagree with both contentions.

The State first contends that there was no evidence elicited from Brotan that defendant or Castronovo submitted to the show of the agents' authority. In support, the State cites to People v. Brodack, 296 Ill. App. 3d 71 (1998), and to Village of Mundelein v. Thompson, 341 Ill. App. 3d 842 (2003). In Brodack, the officer learned from a dispatch that a car was driving erratically and he received a partial license plate number. Eventually, the officer saw the defendant's car, which had a license plate number that agreed with the partial number given to the officer. The officer followed behind the defendant's car for 400 or 500 feet and then activated his overhead emergency lights and siren, but the defendant did not pull over. After continuing on for some distance, the defendant eventually pulled into a Jewel parking lot and stopped. Brodack, 296 Ill. App. 3d at 72. The defendant argued that he had been seized at the moment the officer activated his lights and siren. This court disagreed and held that a stop did not occur until the defendant actually submitted to the show of authority by pulling over and stopping. Brodack, 296 Ill. App. 3d at 75. This court held that the seizure did not occur until the defendant actually submitted to the officer's authority by stopping in the Jewel parking lot. Brodack, 296 Ill. App. 3d at 75.

In Thompson, this court again dealt with the issue of the point at which a seizure occurs. In Thompson, the officer received a dispatch indicating a possible drunk driver. The tipster was driving behind the suspect vehicle. As the officer pulled behind the suspect vehicle, the tipster stated to the dispatcher that the police car was right behind the vehicle. The officer activated his lights and attempted to stop the vehicle. Thompson, 341 Ill. App. 3d at 845. As this was occurring, the tipster gave his name to the dispatcher. As the tipster was giving his address to the dispatcher, the tipster exclaimed, "Man, this guy's refusing to stop." Thompson, 341 Ill. App. 3d at 849-50.

The parties and the trial court all believed that a seizure occurred when the officer attempted to halt the suspect vehicle by activating his emergency lights or siren or both. Thompson, 341 Ill. App. 3d at 848. This court held that, to the contrary, the seizure occurred only when the suspect vehicle began to submit to the officer's show of authority. Thompson, 341 Ill. App. 3d at 849. We concluded that the seizure occurred after the tipster had given his name and address to the police (Thompson, 341 Ill. App. 3d at 850), rendering the tip reliable (Thompson, 341 Ill. App. 3d at 851). This court also noted that a seizure occurs either where physical force is used on the suspect or, absent the use of physical force, where the suspect submits to the assertion of authority, stating that "[i]t is merely _necessary_ but not _sufficient_ that, taking all circumstances into consideration, a reasonable person in the position [of the defendant] at issue would have believed that he was not free to leave." (Emphases in original.) Thompson, 341 Ill. App. 3d at 848. (We note that this case was decided before Luedemann, perhaps explaining why this court included the "free-to-leave" test in its analysis of when a seizure may be deemed to occur.)

The rule we draw from Brodack and Thompson is that a person who is fleeing from a show of authority has not submitted to it and, therefore, has not been seized. It is only when the person

begins to submit to the assertion of authority, by stopping or by beginning to stop, that we may deem a seizure of the person to have occurred. Thompson, 341 Ill. App. 3d at 849; Brodack, 296 Ill. App. 3d at 75. The distinction between stopping and beginning to stop will not often be important; however, in a case like Thompson, where the issues include the reliability of a tipster's information, we may have to parse the circumstances very finely indeed. See Thompson, 341 Ill. App. 3d at 848-50 (in determining reliability of the tip, and where the tipster was talking to police simultaneously with the officer's efforts to stop the defendant, the court concluded that the evidence showed that the tipster gave police his name and address before the defendant began to stop his vehicle, thereby submitting to the officer's show of authority).

The State argues that "no evidence was adduced to demonstrate either" "a demonstration of an exercise of physical force on the part of the police against the subject, or, [a] demonstration that there was a submission on the part of the subject to the authority of the police." To the contrary, upon Hilgers's "tapping of the siren and flashing of overhead lights," both defendant and Castronovo followed the implied command to stay put. See Laake, 348 Ill. App. 3d at 350 (activation of lights and siren directed at an individual is interpreted as a command to stay put). Defendant did not get out of the car and walk away. Rather, defendant stayed put, as he had been commanded to do by the activation of the lights and siren of Hilgers's vehicle, thereby submitting to the show of authority.

The State's contention also appears to cover a scenario in which neither defendant nor Castronovo submitted to the show of authority because they subjectively intended to remain at the spot regardless of any actions undertaken by the agents. In such a situation, they did not submit to the show of authority, because it had no impact upon their intentions and their actions. Under the State's analysis, they were not seized, because they were not submitting to the show of authority.

Further, when the agents request that defendant and Castronovo exit the car, they still were not seized, because this was a noninvestigative encounter between the agents and defendant and Castronovo. When Castronovo and defendant opened the car doors and exited, the agents smelled a particularly strong odor of marijuana, giving them probable cause to seize defendant and Castronovo, and it was only after this point, according to the State's argument, that the men were seized. The problem, however, with the State's contention is that it sweeps too broadly. If the target of the investigative stop flees, then he or she is obviously not submitting to the show of authority. If, however, the target does not flee, then he or she is still not submitting to the show of authority, because it was his or her intent to stand his or her ground regardless of the police presence. The fly in the ointment, however, is the fact that submission appears to be exactly the same as refusing to submit. The target stays put. If such behavior denotes both submission and refusal to submit, then our inquiry is removed from the objective reasonable person and focuses on the target's subjective intent, and this would both be contrary to the law as it has developed and disturb any predictability in search-and-seizure law. The State's argument, then, cannot be accepted.

Even under the State's subjective-intent-to-stand-his-ground argument, however, we still conclude that a seizure occurred and that it was unjustified by reasonable suspicion or probable cause. Accepting for the sake of argument that defendant subjectively did not intend to submit to a show of authority, the question that must be answered upon the show of authority is whether a reasonable innocent person would have felt free to leave or to terminate the encounter with the agents. Based on the totality of the evidence adduced at the suppression hearing, we conclude that a reasonable person would not have felt free to leave or to terminate the encounter. Upon the show of authority, then, defendant was seized because a reasonable innocent person in the same

circumstances would not have felt free to leave or to terminate the encounter, notwithstanding his subjective intent to stay put even absent the show of authority. In other words, defendant's subjective intent to remain at the spot does not trump the objective inquiry of whether a reasonable innocent person would have felt free to leave or to terminate the encounter.

Accordingly, we do not accept the State's contention that there was no evidence that defendant submitted to the agents' show of authority when Hilgers briefly activated his lights and siren, because the undisputed evidence showed that defendant did not flee or otherwise attempt to leave the location, and a reasonable innocent person in the same circumstances would not have felt free to leave or to terminate the encounter. Indeed, when the agents approached Castronovo's vehicle and asked defendant to get out of it, he again complied, further indicating his submission to police authority through his cooperation, both with the earlier command to stay put and with the current request to exit.

We agree with defendant that Village of Mundelein v. Minx, 352 Ill. App. 3d 216 (2004), is instructive.[3] There, an officer received a report of erratic driving, located the suspect, and followed him to his apparent home, noting that the suspect did not drive erratically while the officer followed. As the suspect pulled into the driveway and got out of the car, the officer pulled up behind the defendant and activated his emergency lights either at this moment or shortly before reaching the driveway. Minx, 352 Ill. App. 3d at 218-19. The defendant apparently did not notice the police

_____

[3]Justice O'Malley, writing for the majority, criticized Minx in People v. DiPace, 354 Ill. App. 3d 104 (2004). The point of disagreement, however, concerned Minx's analysis of the reliability of the tip and the tipster. Here, by contrast, we are concerned with the issue of when submission to a show of authority is evidenced. DiPace did not criticize Minx's treatment of that issue.

-18-

vehicle until he exited his car; at that point, the defendant stopped and did not feel free to leave. This court held that, when the defendant noticed the emergency lights, he submitted to the implied command to stay put and did not leave. Minx, 352 Ill. App. 3d at 220.

While Minx is not quite the static situation presented in this case, it is instructive. The defendant in Minx was in his driveway when he noticed the officer's flashing emergency lights. The defendant in Minx stopped; he did not continue walking the few steps into his house. Likewise here. When Hilgers activated his lights and siren, defendant did not attempt to leave, but he stayed put. Obeying the implied command of the lights and siren to stay put qualifies as evidence of defendant's submission to the show of authority.

In addition, we hold that, after Hilgers had briefly activated his lights and siren, a reasonable innocent person would not have felt free to decline the encounter. See Luedemann, 222 Ill. 2d at 550. An innocent person conversing with another in a legally parked car in the afternoon would reasonably believe that a police car pulling behind him or her and activating its lights and siren, albeit briefly, was evidencing the desire to engage in some sort of official police-citizen encounter that the person could not ignore, decline, or terminate. Thus, when the agents approached the car, the occupants had already been seized, and, as we held above, there were no grounds evident in the record to support such a seizure. Accordingly, the agents' detection of the odor of marijuana and their observation of the suspect plastic bag occurred after the improper seizure had taken place.

Next, the State contends that the trial court relied, improperly, on the "free-to-leave" test that was impliedly modified in Luedemann. The State argues that People v. Cosby, 231 Ill. 2d 262 (2008), and Luedemann set forth the factors by which the occurrence of a seizure may be determined. Specifically, the factors include the threatening presence of several police officers, the officer's

display of a weapon, physical touching of the citizen's person, and the use of language or tone of voice that indicates compliance with the officer's request may be compelled. Cosby, 231 Ill. 2d at 274, 287; Luedemann, 222 Ill. 2d at 553. In addition, factors indicative of a seizure of a parked car include boxing it in with other vehicles, the approach on all sides by many officers, pointing a gun at the suspect, ordering the suspect to place his hands on the wheel, and the use of flashing lights as a show of authority. Luedemann, 222 Ill. 2d at 557. The State asserts that only a single factor mentioned in Luedemann is present in this case, namely, flashing lights (and siren), and then only briefly, leading to the conclusion that defendant was not seized. We disagree. Our analysis of the circumstances above leads us to conclude that Hilgers's activation of the lights and siren was a sufficient show of authority to result in deeming defendant and Castronovo seized upon that activation.

Additionally, we note that the cases are legion in other jurisdictions in which the activation of lights or siren or both has been deemed a sufficient show of authority to result in the seizure of a parked car. See, e.g., Hammons v. State, 327 Ark. 520, 528, 940 S.W.2d 424, 428 (1997) (parked car was seized when the officer activated the emergency light; the emergency light was a show of authority that would indicate to a reasonable person he was not free to decline the encounter); People v. Bailey, 176 Cal. App. 3d 402, 405-06, 222 Cal. Rptr. 235, 236-37 (1985) (police pulled in behind a parked car and turned on emergency lights; the defendant was held to be seized because a reasonable person would not have felt free to leave or decline the encounter); State v. Donahue, 251 Conn. 636, 643, 742 A.2d 775, 780 (1999) (the defendant held to be seized at the moment the police pulled up behind his parked vehicle and switched on their flashing lights); Hrezo v. State, 780 So. 2d 194, 195 (Fla. Dist. Ct. App. 2001) (when an officer activates emergency lights behind a lawfully

parked vehicle, a reasonable person would expect to be stopped if he or she tried to drive away; the defendant was seized upon the activation of the emergency lights because such activation "is typically regarded as an act that initiates an investigatory stop"); State v. Morris, 276 Kan. 11, 20, 72 P.3d 570, 577 (2003) (the defendant was seized at the moment the officers pulled up behind his parked car and activated their emergency lights); Lawson v. State, 120 Md. App. 610, 616-18, 707 A.2d 947, 951 (1998) (the activation of emergency lights was held to effect a seizure because it communicated to a reasonable person in the parked car the officer's intent to curtail the defendant's freedom to leave or avoid the encounter; the defendant complied with show of authority and remained stopped); State v. Williams, 185 S.W.3d 311, 317 (Tenn. 2006) (the activation of emergency lights constituted a seizure because it was a show of authority from which a reasonable person would not have felt free to leave or to decline the encounter); Wallace v. Commonwealth, 32 Va. App. 497, 503, 528 S.E.2d 739, 741-42 (2000) (the driver in a parked vehicle was seized when the police car pulled in behind him and activated its emergency lights; such a person would not have felt free to leave or otherwise avoid the encounter); State v. Stroud, 30 Wash. App. 392, 396, 634 P.2d 316, 318-19 (1981) (court held that the defendant was seized at the moment the police pulled up behind the defendant's parked vehicle and switched on their emergency lights).

While the flashing lights of a police car are a sufficient show of authority to effect a seizure, the seizure must still be found to be reasonable, and there is nothing in the evidence here to suggest any justification, such as the agents were performing a community caretaking function or otherwise promoting public safety to justify the seizure in this case. There was no testimony that defendant or Castronovo was in distress or needed aid (indeed, Brotan positively testified that he observed nothing to make him think that defendant was in any sort of medical or other difficulty). The State

suggests that the activation of the lights and siren was to avoid any armed confrontation with defendant or Castronovo. That justification, however, strongly supports the idea that the agents were indeed seizing defendant and Castronovo. It likewise improperly relies on the agents' subjective intent in purporting to determine whether a seizure occurred. The State does not argue that there is anything in the record to support the seizure on the basis that defendant and Castronovo were armed or even that, if they were armed that fact would justify their seizure, which, according to the State, occurred later after probable cause had been developed. Even if we were to agree that flashing lights alone might not always result in a seizure, our review of the evidence and our consideration of the totality of the circumstances convince us that an unreasonable seizure did indeed occur when Hilgers activated his emergency lights and siren.

Additionally, while the "free-to-leave" test may not recite the proper terminology in a traffic-type stop, the appropriate test, whether a reasonable, innocent person would have felt free to decline the officer's requests or to terminate the encounter (Luedemann, 222 Ill. 2d at 550), is functionally the same as the "free-to-leave" test and involves precisely the same considerations. We do not understand the trial court's use of the "free-to-leave" test to be erroneous; rather we understand the trial court's statement that defendant did not feel free to leave to mean that defendant felt he had to acquiesce to the implied command to stay put and to cooperate with the agents' inquiries. Accordingly, we hold that defendant was seized when Hilgers activated his lights and siren, and we reject the State's contention that the seizure occurred only after defendant had exited Castronovo's vehicle and the agents had observed the plastic bag and smelled the odor of marijuana.

Last, the State contends that the search warrant gave the agents an adequate basis to seize Castronovo and defendant. In support of this argument, the State cites to Rochon v. State, 2008 OK

CR 1, 176 P.3d 362. In Rochon, the police had a warrant to search the defendant's home. Before they could execute the search, the defendant and another male drove away in the defendant's car. The officer maintaining surveillance on the defendant's home requested a uniformed officer to stop the defendant's car. The uniformed officer stopped the defendant's car, noting that neither the defendant nor the other man was wearing a seatbelt. Rochon, 2008 OK CR 1 at ¶4, 176 P.3d at 363. About 20 or 25 minutes into the stop of the defendant, the officers executing the search warrant at the defendant's house discovered illegal drugs in plain sight. Thereupon, the defendant was arrested and taken back to his house and held there while the search of the house was completed. Rochon, 2008 OK CR 1 at ¶5, 176 P.3d at 363.

On appeal, the defendant argued that his detention for the traffic stop was illegal because it lasted longer than necessary to accomplish the purpose of the stop. The court, however, held that the defendant was lawfully detained while his house was being searched pursuant to the lawful search warrant. Rochon, 2008 OK CR 1 at ¶9, 176 P.3d at 363-64. The court based this conclusion on the case of Michigan v. Summers, 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981), in which the Supreme Court held:

"If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home. Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Summers, 452 U.S. at 704-05, 69 L. Ed. 2d at 351, 101 S. Ct. at 2595.

The Supreme Court further held that the law enforcement interests served by the detention included the prevention of harm to officers and residents, the prevention of flight by the suspect, and the orderly completion of the search, which was facilitated by the presence of the occupants. Summers, 452 U.S. at 702-03, 69 L. Ed. 2d at 350, 101 S. Ct. at 2594. Subsequently, in Muehler v. Mena, 544 U.S. 93, 99 n.2, 161 L. Ed. 2d 299, 307 n.2, 125 S. Ct. 1465, 1470 n.2 (2005), the Supreme Court held that "Summers makes clear that when a neutral magistrate has determined police have probable cause to believe contraband exists, '[t]he connection of an occupant to [a] home' alone 'justifies a detention of that occupant.' [Citation.]"

The Rochon court used these holdings, plus a Tenth Circuit case interpreting them, to determine that the defendant was simply being detained as the police executed a lawful warrant to search his home for contraband. Rochon, 2008 OK CR 1 at ¶9, 176 P.3d at 364. The Rochon court noted that the defendant's detention occurred as soon as practicable, due to the surveilling officer's decision to have a uniformed police officer make the stop, and further, the defendant's return to his house served the purpose, under Summers, of facilitating the orderly completion of the search of the premises, because the defendant was able to give the police the combination to a safe in which contraband was discovered, thereby allowing the police to complete the search without destroying the defendant's property. Rochon, 2008 OK CR 1 at ¶11, 176 P.3d at 365.

While there are similarities to Rochon, this case is nevertheless distinguishable. Importantly, there was no evidence to demonstrate that defendant and Castronovo were being detained at the same time the police or the DEA were executing the search warrant on Castronovo's residence. Because of this lack of evidence, we cannot conclude that Castronovo's detention (and, by extension, defendant's) played any part in facilitating an orderly search of Castronovo's residence. Rather,

Brotan testified only that he was "involved" in a search warrant and did not execute the search warrant at the residence before stopping Castronovo. Based on these distinctions, we find that Rochon does not apply. Rather, much like United States v. Edwards, 103 F.3d 90, 94 (10th Cir. 1996), the case Rochon cited in which the defendant was detained in a traffic stop by the side of the road but never returned to his residence during the search, leading the court to conclude that the traffic detention of the defendant played no part in facilitating the orderly execution of the search being carried out close by, we too believe that the detention here could have played no part in facilitating the orderly completion of the search warrant for Castronovo's house. Because the detention of defendant fulfilled no proper purpose, the search warrant for Castronovo's house cannot provide an adequate basis for the seizure of defendant.

Last, we note that the State argues that the trial court erred in determining that the DEA agents "stopped" Castronovo's car despite the testimony that Castronovo's car was already legally parked and was not in motion at the time the agents pulled in behind it. According to the State, this mistaken premise on the trial court's part "led to a flawed analysis" and reversible error. We disagree.

In the first instance, we note that we do not look to the propriety of the trial court's reasoning, but rather, we review the trial court's result. It does not matter if the trial court used "a flawed analysis" so long as the trial court reached the correct result. Here, we have held that the trial court properly granted the motion to suppress evidence. Second, and more importantly, the record clearly demonstrates that the trial court correctly apprehended the circumstances and did not use an "erroneous premise" in analyzing the issues in this case. The court explained to the parties:

"When I use that phrase, 'pull the vehicle over,' the vehicle had stopped. There were two vehicles involved. The vehicle stopped, and the officers pulled over.

When I make reference to stopping of the vehicle, when the officer places the Mars lights or red lights on and activates the siren, I use that phrase. At that point in time I believe there was a stop. That's just so it's clear on the record."

The court's explanation makes clear that it was attempting to conform its explanation to standard terminology used in traffic stops or Terry stops. The State's contention is without merit.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

McLAREN and JORGENSEN, JJ., concur.